UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| BRANDON N. BRYANT, ) | CASE NO. 1:12CV2122 |
| ) | |
| Plaintiff, ) | JUDGE JAMES S. GWIN |
| ) | |
| v. ) | Magistrate Judge George J. Limbert |
| ) | |
| CAROLYN W. COLVIN[1], ) | **REPORT AND RECOMMENDATION** |
| ACTING COMMISSIONER OF ) | **OF MAGISTRATE JUDGE** |
| SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

Brandon N. Bryant ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying his application for Supplemental Security Income ("SSI"). ECF Dkt. #1. For the following reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case with prejudice.

I.   **PROCEDURAL AND FACTUAL HISTORY**

On April 8, 2008, Plaintiff applied for SSI alleging disability beginning on December 1, 2000, when Plaintiff was sixteen years of age. Plaintiff was twenty-four years of age when he filed his application, and twenty-six years of age at the hearing. ECF Dkt. #12 ("Tr.") at 142-144.[2] The SSA denied Plaintiff's application initially and on reconsideration. Tr. at 88-89. Plaintiff requested an administrative hearing, and, on November 11, 2010, an ALJ conducted an administrative hearing *via* videoconference and accepted the testimony of Plaintiff, who was represented by counsel, and

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2]References to the administrative record in this case refer to the ECF docket number of the cited document and the page number assigned to cited pleading by the ECF system, which can be found in the search box at the top of the page on the ECF toolbar.

Larry Takki, an impartial vocational expert ("VE"). Tr. at 43-87. Plaintiff filed a request for review, which was denied by the Appeals Council on June 19, 2012. Tr. at 2-6.

On August 17, 2012, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On January 18, 2013, Plaintiff filed a brief on the merits. ECF Dkt. #14. On March 4 2013, Defendant filed a brief on the merits. ECF Dkt. #15. Plaintiff filed a reply brief on March 16, 2013. ECF Dkt. #16.

**II**.    **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff suffered from right upper extremity pain and weakness post status right ulnar artery ligation and flexor tendon repair, which was performed on September 16, 2005, and borderline intellectual functioning, which qualified as severe impairments under 20 C.F.R. §416.920(c). Tr. at 22. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§416.920(d), 416.925 and 416.926 ("Listings"). Tr. at 22-23.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 416.967(b), except that Plaintiff is limited to sitting, standing, and walking six hours in an eight-hour workday with normal breaks; he must avoid ladders, ropes, and scaffolds; he is limited to occasional handling and fingering with the right upper extremity and has unlimited use of his left hand; and he is limited to performing unskilled work with routine changes in the work environment. Tr. at 23.

The ALJ ultimately concluded that, although Plaintiff has no past relevant work, there were jobs that existed in significant numbers in the national economy that Plaintiff can perform, including that of flagger, usher, and parking lot attendant. Tr. at 36. As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

**III.**   **STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of

-3-

the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). When substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir.2001). Thus, the ALJ has a " 'zone of choice' within which he can act without the fear of court interference." *Id.* at 773.

## **V.    ANALYSIS**

Plaintiff advances several arguments in this appeal. First, Plaintiff contends that the ALJ failed to include a limitation to one-step and two-step tasks in the RFC despite crediting the opinion of agency physicians that concluded that Plaintiff was limited to work involving one-step or two-step tasks. Second, Plaintiff contends that the RFC does not accommodate his inability to grasp or finger with his dominant (right) hand. Third, Plaintiff alleges that the ALJ did not fulfill her affirmative responsibility to ask the VE whether his testimony was consistent with the Dictionary of Occupational Titles ("DOT"). Fourth, Plaintiff contends that he cannot perform the occupations identified by the VE, since all of the occupations require two-armed work. Fifth, Plaintiff alleges that the ALJ's Decision was arbitrary because she committed "harmful procedural errors," that is, used the incorrect standard of review and relied on extra-record evidence. Finally, Plaintiff contends that the ALJ erred in not crediting Plaintiff's testimony at the hearing.

### **A.    Evidence in the record**

First, it is important to note that Plaintiff's responses to the ALJ's inquiries at the hearing were often confusing and contradicted by the record. At the hearing, Plaintiff asserted that his memory was poor, that he suffered from problems with his memory, and that he "needs help." Tr. at 52.

For instance, the ALJ's first inquiry involved Plaintiff's explanation for ten theft violations referenced in the record.[3] Plaintiff responded that he "did hang around with the wrong crowd of

---

[3]Notes from William B. Schonberg, Ph.D., a psychologist who conducted a clinical interview and mental and intellectual assessment for the Bureau of Disability Determination on July 29, 2008, indicates that Plaintiff reported that he served an eight-month term of imprisonment after being convicted of drug

-4-

people and got led the wrong way." Tr. at 48. Plaintiff conceded that he used crack cocaine and "stole like some cigarettes." Tr. at 48. Encouraged by his father and grandmother, Plaintiff entered a rehabilitation program. He testified that it had been years since he had used crack cocaine. Tr. at 53. Plaintiff asserted that all ten of the misdemeanor violations referred to in the record were for stealing cigarettes and one pre-paid cell phone. Tr. at 49.

To the consternation of the ALJ[4], Plaintiff could not remember the dates or the details of his incarcerations. Tr. at 50. He explained that he was incarcerated in Richland County for failing to appear while he was on probation. Tr. at 51. The ALJ also asked Plaintiff about a breaking and entering charge and a grand theft charge. Plaintiff explained that he was charged because he was believed to be "the lookout." Tr. at 51. Plaintiff further explained that he was the subject of a protection order, which was withdrawn, but not in time, so it constituted a probation violation. Tr. at 52. Plaintiff further explained that he was charged with aggravated robbery, but it was a case of mistaken identity and his brother was convicted on the crime.

At the hearing, Plaintiff explained that he has difficulty zipping, unzipping, and buttoning his clothing, brushing his teeth, holding a door, and picking up his daughter. He cannot change his daughter's diapers. His hand clenches, especially in cold weather, and his thumb swells. He experiences pain and numbness in his hand and he does not get blood flow to his hand.

Plaintiff testified that he worked with a "Ms. Markley" from BBR, in an effort to find a job he could perform with his limitations. Tr. at 54. Plaintiff further testified that he lives with his father and wanted to work in order to contribute to the household. However, due to Plaintiff's limitations, he testified that no work could be found. Plaintiff explained that he worked as a dishwasher at Bob Evans for almost six months, but was ultimately terminated. The reason for his termination was not clear from his testimony, although he appears to attribute it to his work speed.

---

trafficking in 2006 and that he was currently on probation for a theft conviction in 2007. Plaintiff also told Dr. Schonberg that he had "about ten misdemeanors for theft but had no arrests for at least the past year." Tr. at 500.

[4]At one point, the ALJ chastised Plaintiff, stating "One of the most, one of the most important things that people are ever faced with is criminal violation, and you want me to believe that you just don't remember, because your memory is poor." Tr. at 52.

Tr. at 61.  The ALJ observed that Plaintiff's wages from Bob Evans indicate that he worked there for a much shorter time frame.  Tr. at 62.

With respect to the injury to Plaintiff's right hand, he testified that he was working on a job site helping his father when he accidently put his hand through a window.  Tr. at 57.  Plaintiff further testified that he cut his artery and tendon, as well as the nerves that control the muscle in his hand.  According to the medical notes, Plaintiff underwent surgery on his right arm on September 16, 2005[5] at Mansfield MedCenter ("Mansfield"), when Plaintiff accidentally put his right arm through a window after having locked himself out of his house.  Tr. at 325.  He had previously sought medical attention for his right hand when he injured it by punching a brick wall on June 4, 2005. Tr. at 310.

Although he underwent rehabilitation after his surgery, he testified that he stopped attending rehabilitation when he was informed that his problems, stiffness and involuntary closing of the hand "were going to happen."  Tr. at 58.  However, he returned to the emergency room on June 10, 2006, complaining of ongoing post-operative pain, and he conceded that "he did not follow up as he was supposed to or go to physical therapy as he was supposed to."  Tr. at 347.

On July 20, 2007, Plaintiff underwent an initial hand evaluation by the occupational therapy staff at Mansfield.  Tr. 337-40.  Plaintiff displayed reduced range of motion in his right hand and right wrist Tr. 337. He reported numbness and tingling in some of his right fingers, and pain in his right hand Tr. 337.  He experienced decreased sensation primarily in his fourth and fifth fingers. Tr. 340. The staff also observed some soft tissue atrophy and clawing of Plaintiff's right hand,  Tr. 337, as well as decreased hand use, coordination, and functional strength fingers, Tr. 340.  To combat these symptoms, the staff assigned Plaintiff multiple exercises.  Tr. at 338.  Plaintiff informed the staff, however, that his impending incarceration might impact future treatment sessions.  Tr. at 339.  After attending his July 23, 2007 treatment session, Plaintiff missed appointments on July 25, 27, and 30, 2007. Tr. at 339.  His court case manager notified the Mansfield

---

[5] The ALJ mistakenly concluded that Plaintiff underwent two surgeries on his right arm.  See Tr. at 25-26.  The error appears to be predicated upon medical notes dated September 22, 2005, which indicate that Plaintiff is recovering from "ulnar artery with flexor carpi tendon ulnaris and complex tendon repair on 7/16/2005."  Tr. at 314.  The surgery was performed on September 16, 2005, rather than July 16, 2005.

-6-

staff that Plaintiff might not be able to attend future treatment sessions due to his incarceration. Tr. 339. On July 30, 2007, because Plaintiff had missed three treatment sessions, the Mansfield staff discharged him from occupational therapy. Tr. 339.

Almost eight months later, on March 25, 2008, Plaintiff presented to Third Street Family Health Services ("Third Street") seeking another referral to physical therapy. Tr. 453. He explained that he did not complete his previous physical therapy program due to his incarceration. Tr. 453. The Third Street staff observed Plaintiff to have a claw-like deformity of his right hand consistent with ulnar nerve damage. Tr. 453. Nevertheless, Plaintiff stated that he worked as a dishwasher at New Beginnings Recovery Service ("New Beginnings"). Tr. at 453.

Subsequently, on April 7, 2008, Plaintiff underwent another initial hand evaluation by the Mansfield occupational therapy staff. Tr. at 435-36. He maintained mostly reduced range of motion in his right hand and wrist. Tr. at 435. He also had reduced supination, but normal pronation, of his right forearm. Tr. at 435. Plaintiff again complained of numbness and intermittent pain in his right hand. Tr. at 435. The staff also repeated its observation that Plaintiff's right hand maintained a claw-like appearance, and had decreased use, coordination, and functional strength. Tr. at 435. The Mansfield staff again assigned Plaintiff multiple exercises at this time, and characterized his prognosis as fair. Tr. at 436.

Plaintiff attended occupational therapy at Mansfield throughout April 2008. Tr. at 564-65. On April 11, 2008, Plaintiff reported arm wrestling and playing basketball at New Beginnings. Tr. at 565. He played basketball so long that his hand turned purple. Tr. at 565. The Mansfield staff advised Plaintiff that he could continue to play basketball, but at a shorter duration, to avoid the discoloration. Tr. at 565. When Plaintiff returned three days later, he reported redness and wrist pain after playing basketball for ten minutes. Tr. at 565. He was advised to continue strengthening activities. Tr. at 565. On April 17 and 21, 2008, Plaintiff reported that his fingers were straighter. Tr. at 564.

On April 24, 2008, Plaintiff told the Mansfield staff that he had been lifting dumbbells with his right hand. Tr. at 564. Four days later, he observed that his hand strength had improved and that self-care had become somewhat easier. Tr. at 564. Plaintiff continued to attend occupational

-7-

therapy at Mansfield in May of 2008. Tr. at 563.  On May 5, 2008, he demonstrated increased pinch strength Tr. at 563. Plaintiff  noted that he could grasp items for longer periods of time. Tr. at 563. Two days later, Plaintiff reported that he painted the interior of his home for an hour.  Tr. at 563. When he finished, Plaintiff felt well and was not tired. Tr. at 563. He completed all of his tasks in therapy and the Mansfield staff added repetitions to his grip and wrist exercises. Tr. at 563.

On May 12, 2008, Plaintiff had decreased range of motion in his right hand, but increased grasp and pinch strength. Tr. at 439. He reported intermittent pain, difficulty picking things up, and problems performing self-care tasks. Tr. at 439. The staff observed that his right hand still had a claw-like appearance. Tr. at 439. Nonetheless, while the staff noted Plaintiff's impaired grasp strength and prehension skills, they reported that Plaintiff's coordination had improved.  Tr. at 439. Plaintiff attended his next occupational therapy session at Mansfield on May 14, 2008.  Tr. at 562. He "reported having an interview at Progress Industries . . ." Tr. at 562. He still complained of curling of the fifth digit in his right hand when he held objects or gripped items. Tr. at 562. The staff prescribed continued therapy with a focus on strengthening his hand. Tr. at 562.

On May 19, 2008, Plaintiff appeared forty minutes late for his therapy session. Tr. at 562. At his next appointment, May 21, 2008, the Mansfield staff noted that Plaintiff had significantly increased range of motion in the fourth and fifth digits of his right hand.  Tr. at 562. Plaintiff's grasp and pinch strength had also improved. Tr. at 562.

On May 25, 2008, Plaintiff presented to Mansfield reporting that a brick fell onto the fifth finger of his right hand.  Tr. at 543-544.  He further reported that he suffered numbness over that finger and the lateral aspect of his right hand due to his prior laceration.  Tr. at 543.  Rina Stein, D.O., found no evidence of fracture or dislocation, and she observed that Plaintiff was able to flex and extend his right fifth finger.

Plaintiff did not appear for his May 28, 2008 therapy session.  Tr. at 562. He cancelled his May 29th appointment due to work responsibilities.  Tr. at 561. Plaintiff cancelled his June 4, 2008 session because it conflicted with other scheduled appointments.  Tr. at 561. He did not appear for his June 16th appointment, and cancelled his June 20th and 25th sessions.  Tr. at 560-61. Consequently, on July 18, 2008, the Mansfield staff again discharged Plaintiff from occupational

therapy. Tr. at 560. On December 19, 2008, Plaintiff returned to Third Street and requested another referral to physical therapy. Tr. at 627-28. The record does not show or suggest that Plaintiff actually attended another round of treatment.

On September 2, 2008, Eli Perencevich, D.O., a state agency physician, concluded that Plaintiff retained the physical residual functional capacity to perform a modified range of light work Tr. at 526-32. Dr. Perencevich opined that Plaintiff could occasionally handle and finger with his right hand. Tr. at 528. He also retained an unlimited ability to push and pull. Tr. at 526. Maria Congbalay, M.D., another state agency physician, affirmed Dr. Perencevich's findings on February 3, 2009. Tr. at 622.

In December of 2008, Michael Dawes, M.D., assessed Plaintiff's residual functional capacity Tr. 615-16. He concluded that Plaintiff had marked limitations in pushing, pulling, and handling with his right arm. However, he further concluded that Plaintiff remained able to lift up to twenty pounds frequently and up to ten pounds occasionally. Tr. at 615- 16.

Several months later, on February 11, 2009, Robert L. Dawson, M.D., wrote a "To Whom It May Concern" letter on Plaintiff's behalf. Tr. 619. He reported that Plaintiff had clawing, cold intolerance, and severe interosseous wasting in his right hand. Tr. at 619. Plaintiff also had positive Wartenberg, Jeanne, and Masse signs. Tr. at 619. His Allen test suggested decreased flow to his ulnar artery. Tr. at 619. Plaintiff also had no two-point discrimination in his ulnar nerve distribution, but maintained normal discrimination in his median nerve. Tr. at 619.

Approximately four months after that, on June 3, 2009, Plaintiff returned to Third Street with right hand pain and weakness. Tr. at 624-25. He asserted that he had received a recommendation for surgery, but could not proceed without insurance. Tr. at 624. On examination, Plaintiff exhibited dysfunction in his motor system. Tr. at 625.

Approximately seven months later, on January 18, 2010, Mei-Chiew Lai, M.D., a physiatrist[6], evaluated Plaintiff based on his complaints of pain, numbness, muscle shrinkage, and

---

[6] Dr. Lai's letterhead characterizes her specialization as physical medicine and rehabilitation.

-9-

clawing of his right hand. Tr. at 661-64. Plaintiff reported taking no medication for his symptoms. Tr. at 662.

On examination, Plaintiff displayed decreased sensation to pin prick and light touch at the ulnar third of his right palm, the right fifth finger, and the ulnar half of his right fourth finger. Tr. at 662. He also had weakness in his right hand grip, his right fingers, and his right wrist. Tr. at 662. Plaintiff's right hand had a claw-like appearance, and had severe atrophy of the intrinsic muscle. Tr. at 662. Notwithstanding these findings, Plaintiff maintained full range of motion in his right wrist. Tr. at 663. He had limited active range of motion in the MCP and IP joints of his fourth and fifth fingers, but full range of motion in the same joints of his first, second, and third fingers. Tr. at 663. Plaintiff also demonstrated no tenderness with palpation to his right hand. Tr. at 663.

Functionally, Dr. Lai opined that Plaintiff manipulated objects clumsily with his right hand Tr. at 663. He could not make a complete fist with his right hand. Tr. at 663. And unlike his left hand, Plaintiff had difficulty zippering, buttoning, opening doors, and picking up small objects with his right hand. Tr. at 663. He also could only perform prehension with his right thumb to the tips of his right first, second, and third fingers. Tr. at 663. Nonetheless, Plaintiff had no difficulty reaching overhead or backward with either arm. Tr. at 663. He could also tie his shoelaces, but with difficulty. Tr. at 663.

Ultimately, Dr. Lai concluded that Plaintiff might still "be able to use the right upper extremity [for] . . . gross activities" Tr. at 663. With respect to employment, Dr. Lai opined that Plaintiff might not be able to handle a factory-production job. Tr. at 664. She also felt that "anything that [Plaintiff] needs to be doing is only able to be using the one hand to do it." Tr. at 664.

Turning to his mental limitations, Plaintiff testified that he suffers from obsessive compulsive disorder and depression. Tr. at 65. Plaintiff described feelings of worthlessness, crying spells, and sleeping a lot. Plaintiff testified that he sometimes hears voices. Plaintiff sought treatment at the Center for Individual and Family Services. He was prescribed 10 mg. of Zoloft but testified that he had difficulty trusting his first physician, who then left the practice. Plaintiff further testified that he had to wait a month to be assigned a new physician. Plaintiff informed his new physician that

the prescribed amount of Zoloft was not effective, however the new physician insisted that Plaintiff remain on the same dosage. Tr. at 67. Plaintiff now attends anger management at the Center.

William B. Schonberg, Ph.D., a psychologist, performed a consultative examination on July 29, 2008. Tr. at 499-506. Plaintiff stated that he took no medication and had not been hospitalized for any psychiatric disorders. Tr. at 500. He complained of difficulty with concentration and memory, but he had logical, coherent, and goal-directed thought processes. Tr. at 501. Moreover, he could recall recent and past events without obvious difficulty. Tr. at 502. Plaintiff had some insight into his problems and limited judgmental and common sense reasoning. Tr. at 502.

Dr. Schonberg opined that Plaintiff had a verbal IQ score of 64, a performance IQ score of 59, and a full-scale IQ score of 59. Tr. at 503. Nonetheless, he determined that Plaintiff cognitively functioned in the borderline range. Tr. at 502. He assigned a global assessment of functioning ("GAF") score of 60. Tr. at 503. Ultimately, Dr. Schonberg opined that although Plaintiff had a moderately impaired ability to understand, remember, and follow directions, he could still comprehend and complete many simple, routine tasks at home and in the community. Tr. at 504. Moreover, Dr. Schonberg found Plaintiff had no comprehension or memory problems. Tr. at 504. Plaintiff had a moderately impaired ability to maintain attention, concentration, persistence, and pace for simple, repetitive tasks, and to withstand the stress and pressures of day-to-day work activity. Tr. at 504. Nonetheless, Dr. Schonberg concluded that Plaintiff retained the mental ability to perform simple, repetitive work tasks. Tr. at 504.

A few weeks later, on August 11, 2008, Robelyn Marlow, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form. Tr. at 507-20. He concluded that Plaintiff suffered only mild restrictions to his activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. Tr. at 517. That same day, Dr. Marlow also completed a Mental Residual Functional Capacity Assessment. Tr. at 521-24. He concluded that Plaintiff could perform one and two step, routine, repetitive tasks. Tr. at 523. Plaintiff could also work at a steady pace necessary for simple, repetitive work. Tr. at 523. Later, on December 29, 2008, Tasneem Khan, Ed.D., another state agency psychologist, affirmed Dr. Marlow's assessment. Tr. at 612.

-11-

On September 29, 2009, Richard Litwin, Ph.D., performed a partial psychological evaluation. Tr. 656-58. He assessed Plaintiff as having a verbal IQ score of 75, a performance IQ score of 74, and a full-scale IQ score of 72. Tr. at 656. As such, he determined that Plaintiff had borderline intelligence, not mental retardation. Tr. at 656. Plaintiff displayed minor strength in non-academic tasks involving, among other things, attention to detail. Tr. at 656-57. While Plaintiff's memory was weak, his attention span was fair. Tr. at 657. Dr. Litwin stated that Plaintiff might be able to obtain a GED with competent tutoring and effort. Tr. at 657. He did not believe Plaintiff could maintain employment without mental health treatment. Tr. at 658.

According to Dr. Litwin, Plaintiff "may be able to [perform] some simple manual labor assuming this is feasible given his one bad arm." Tr. at 658. At the hearing, the ALJ noted that Dr. Litwin had encouraged Plaintiff to get his GED and asked Plaintiff if he had made any effort to complete his education. Plaintiff responded that his mother encouraged him to pursue his GED and bought him a computer. Tr. at 68. However, it appears that Plaintiff made no effort to obtain his GED.

### B.     VE testimony

At the administrative hearing, the ALJ asked the vocational expert whether occupations existed for someone of Plaintiff's age, education, work experience, and the residual functional capacity to perform unskilled light work that involved no climbing of ladders, ropes or scaffolds; up to occasional handling and fingering with the dominant hand; and routine changes in the work environment. Tr. at 71. The vocational expert answered affirmatively and listed the representative occupations of flagger, usher, and parking lot attendant. Tr. at 71-72. The vocational expert also noted that these occupations accommodated the ALJ's additional limitations of no work at a production pace and the need for extra time to complete tasks. Tr. at 72-73. The vocational expert later explained that the flagger positions, usher positions, and most parking lot attendant positions could be performed with the use of only one arm. Tr. at 74-75. The vocational expert also noted that all of these occupations required no more than one and two-step instructions. Tr. at 78.

### C. **Plaintiff's arguments**

It is important to note that Plaintiff does not contend that the ALJ erred in assigning weight to the various examining and non-examining physicians in the record. Rather, Plaintiff argues that the ALJ, having given some weight to the opinions of certain physicians in the record, failed to include those limitations in the RFC. He further contends that the ALJ committed procedural errors, and erred in discounting Plaintiff's testimony at the hearing. Plaintiff's arguments will be taken out of order for the purpose of greater clarity of analysis.

First, Plaintiff contends that the ALJ failed to include a limitation to one and two-step tasks in the RFC. Plaintiff's third argument is related to his first argument, that is, Plaintiff contends that the ALJ failed to resolve the conflict between the VE's testimony and the DOT, that there are GED reasoning level 2 occupations that only require one and two-step tasks, before relying upon the VE's testimony.

Although it is true that the RFC does not include the specific requirement of one and two-step tasks, it is clear nonetheless that both the ALJ and the VE factored one and two-step tasks into the analysis that led to the denial of benefits in this case. Plaintiff's counsel, at the hearing, added the one and two-step limitation to the ALJ's hypothetical. Tr. at 76. The VE responded that the representative occupations that he identified were "entry level jobs that require on and two-step direction." Tr. at 76.

At the hearing, Plaintiff's counsel raised the issue with reference to SVP levels, which lead to a lengthy discussion regarding SVP levels and GED reasoning levels. After a brief discussion of the distinction between SVP levels and GED reasoning level, Plaintiff's counsel argued that the representative occupations identified by the VE were assigned a GED reasoning level two. The DOT defines GED reasoning level two jobs as jobs requiring "detailed but uninvolved written or oral instructions." At the hearing, the VE conceded that each of the positions he identified had a GED reasoning level of two.

However, the ALJ, acknowledging the conflict between the VE's testimony and the DOT, specifically requested an explanation from the VE regarding his departure from the DOT:

> "Q: . .[I]n your experience as a vocational rehabilitation counselor, are there jobs at an SVP: 1 and SVP: 2, that, that involve one and two steps? Are there jobs at both SVP: 1 and SVP: 2 level that are considered unskilled jobs that are – that require only one and two steps?
>
> A: Yes, I mean a flagger here has an SVP: 2, but they, they stand out and they hold a sign one way, and then they turn it around when they're told to, you know, stop traffic, so I don't believe that's any more than one or two steps. Same with an usher, you take a ticket, you sit somebody down, you're doing one thing at a time, you take one ticket, then you walk them down. That's not a multi-step tasks [sic], it doesn't require, you know, anything more than a simple demonstration to show how to do the job." Tr. at 78.

Based upon the foregoing discussion, the undersigned recommends that the Court find that Plaintiff's first and third arguments have no merit. While it is true that the ALJ credited the opinion testimony in the record that Plaintiff is limited to one and two-step tasks, it is clear that the ALJ considered that limitation when he formulated the RFC. At the hearing, there was a lengthy discussion regarding the VE's testimony that the representative occupations, although characterized in the DOT as GED reasoning level two jobs, are one and two-step jobs. The ALJ specifically inquired as to the VE's reasoning for the conflict, which the VE articulated at the hearing.

"The ALJ and consulting vocational expert are not bound by the [DOT] in making disability determinations because the Social Security regulations do not obligated them to rely on the [DOT] classifications." *Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir.2003). Furthermore, "[t]he DOT lists maximum requirements of occupations as generally performed. . .[a vocational expert] . . .may be able to provide more specific information about jobs or occupations that the DOT." SSR 00-4p, 2000 WL 1898704, *3 (2000). Here, the VE provided a reasonable explanation for the conflicts in the occupational information provided at the hearing.

Like his first argument, Plaintiff's fourth argument – that the representative occupations identified by the VE constitute two-handed jobs – is belied by the evidence at the hearing. At the hearing, the VE testified that each of the representative occupations could be performed with one hand:

> "Plaintiff's counsel: If we substituted occasional handling and fingering with no functional use of the dominant right hand, and I say no functional use, because I believe it probably is true that on some days he has some minimal use, but it is not something that he has use of on a consistent basis, and I – having observed his hand, I believe that to be true, but I understand I can't testify. If we made that the hypothetical, how would that affect your response?

-14-

> VE: Well, do they, do they use – can they use the – that upper extremity in an assistive manner?
>
> Plaintiff's counsel: Assistive in what way?
>
> ALJ: As a guide.
>
> VE: As a guide. Okay. For – okay let me (INAUDIBLE) two questions, the flagger or the usher position can – the essential job duties can be done with, with one arm. You don't need bilateral use. For the parking lot attendant, taking coins out of the casher [sic] register and giving back only requires one hand, however, you might be – if you could use the non-dominant or the affected hand to lay dollar bills in, if you're giving change, and then use the other hand to give the, the money to, so it's not really doing anything but serving as a platform or a hole to put dollar bills in. If that would help do the job if you didn't really have that ability, you had no use at all of that other upper extremity, you could do the job, it would just take you a little bit longer.

Tr. at 73-74. Because the VE testified that the representative occupations could be performed with one hand, the undersigned recommends that the Court find that Plaintiff's fourth argument does not have merit.

In his second argument, Plaintiff asserts that the RFC does not accommodate his inability to to grasp or finger with his dominant right hand. The ALJ concluded that Plaintiff was capable of occasional handling and fingering with his right hand. Plaintiff cites SSR 83-10 for the proposition that "occasional" use is defined as "one-third of the workday." ECF Dkt. #14 at p. 4. In fact, SSR 83-10 reads, in pertinent part, " 'Occasionally' means occurring from very little up to one-third of the time." *Id.* at *5.

Here, the VE specifically testified that the representative occupations he identified could be performed with one hand. Furthermore, as the ALJ explained, there was considerable evidence that supported her decision to limit Plaintiff to up to occasional handling and fingering with his right hand. Tr. at 23-36. For example, Plaintiff worked intermittently from 2005 to 2007 as an assembly-line worker and painter. Tr. at 197. In 2008, he worked as a dishwasher. Tr. at 61-62, 453, 661. He played basketball, arm wrestled, and lifted dumbbells. Tr. at 565. He also spent time painting the interior of his home. Tr. at 563. Based upon the testimony of the VE and the evidence in the record, the undersigned recommends that the Court find that Plaintiff's second argument does not have merit.

Turning to Plaintiff's fifth argument, the ALJ neither applied the wrong standard of review not relied upon evidence outside of the record. Although the ALJ referred to the substantial evidence standard, she did so in reference to the standard governing a reviewing court.  Next, her inquiries regarding Plaintiff's criminal record were predicated upon specific references in the record to both his convictions and his incarcerations.  Accordingly, the undersigned recommends that the Court find that Plaintiff's fifth argument is not well-taken.

Turning to Plaintiff's final argument, an ALJ may discount a claimant's credibility where the ALJ finds contradictions among the medical records, claimant's testimony, and other evidence. *Walter,* 127 F.3d at 531.  "It [i]s for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir.2001), quoting *Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir.1972).  Nevertheless, an ALJ's credibility determinations regarding subjective complaints must be reasonable and supported by substantial evidence.  *Rogers,* 486 F.3d at 249.

As previously stated, the ALJ's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson,* supra. Substantial evidence is more than a mere scintilla, but only so much as would be required to prevent a judgment as a matter of law if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir.1988) (citing *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660 (1939)).

Here, Plaintiff's testimony was often contradicted by the evidence in the record.  It is clear that the ALJ questioned Plaintiff's veracity and discounted his assertion that he could not recall significant events in the record.  Moreover, Plaintiff appears to have intentionally mischaracterized the accident that damaged his right hand.  At the hearing, he stated that he injured his hand while working, while the medical records show that he injured himself trying to gain entrance to his own home after locking himself out of the residence.  Although Plaintiff claimed at the hearing that he struggled with memory problems, Dr. Schonberg noted no memory or concentration problems. Tr. at 504.

### **VI.** **CONCLUSION**

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case with prejudice.

DATE: September 3, 2013            */s/George J. Limbert*
                                                 GEORGE J. LIMBERT
                                                 UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).